No. 23,200.

THE STATE OF KANSAS, *Appellee*, v. O. M. ELLIOTT, *Appellant*.

SYLLABUS BY THE COURT.

1. CRIMINAL LAW — *Information Filed by "Acting County Attorney" — When Sufficient to Sustain a Conviction.* The proceedings examined, and *held,* an information for felony which was filed by a person other than the county attorney, and which was not challenged in the district court, was sufficient to sustain a conviction, either as the act of a *de facto* prosecuting attorney, or as the act of a deputy county attorney.

2. SAME—*Information—Larceny of Money—Description of Stolen Property—Evidence.* The information charged larceny of three fifty-dollar bills, lawful money of the United States, a more particular description of which was unknown and could not be given. There was evidence that the bills had been paid and received as cash compensation for services rendered in a real-estate transaction. They were frequently referred to as money by persons who saw them, and they were sufficiently proved to be paper currency, circulating from hand to hand as measure of value and medium of exchange. *Held,* the evidence was sufficient to sustain the charge.

3. LARCENY—*Value of "Three Fifty-dollar Bills."* It was not necessary to call witnesses to prove the value of the bills.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed December 10, 1921. Affirmed.

*Edward Rooney, Otis E. Hungate,* and *Paul H. Heinz,* all of Topeka, for the appellant.

*Tinkham Veale,* county attorney, and *Ralph H. Gaw,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The defendant was convicted of larceny of money, consisting of three fifty-dollar bills, and appeals.

It is said the information was void because filed by a person other than the county attorney. The information stated the capacity of the informant as follows:

"*In the name and by the authority of the State of Kansas,* I, Tinkham Veale, acting county attorney in and for the county of Shawnee and state of Kansas, who prosecutes for and on behalf of said state in the district court of said county, sitting in and for the county of Shawnee, and duly empowered to inform of offenses committed within said county of Shawnee, . . ."

The record discloses that the court took cognizance of the information, and that the defendant pleaded to it without questioning the qualification of the person who assumed to act officially in filing it. The informant was therefore at least a *de facto* prosecuting officer, and the information was not a nullity. (*The State v. Marsh,*

The State v. Elliott.

13 Kan. 596, 600; *In re Gilson, Petitioner,* 34 Kan. 641, 644, 9 Pac. 763; *The State v. Williams,* 61 Kan. 739, 743, 60 Pac. 1050.)

The information alleged that Veale was duly empowered to inform respecting offenses, and was prosecuting for and on behalf of the state, as acting county attorney. That was a fair allegation of deputyship, good at least until properly challenged. It is conceded Veale was in fact deputy county attorney. The statute authorizes the county attorney to appoint a deputy, who may perform all the duties of county attorney during absence or sickness of the elected officer. (Gen. Stat. 1915, § 2267.) The code of criminal procedure does not make it imperative that an information shall be filed by the county attorney in person. The term used is "the prosecuting attorney." (Gen. Stat. 1915, § 7976.) The prosecuting attorney may be any one of several persons. As indicated in the case of *In re Gilson, Petitioner,* 34 Kan. 641, 9 Pac. 763, an assistant attorney-general for a county in which the county attorney is derelict in the performance of duty, may file informations, and a deputy, acting for the county attorney in his absence or while he is sick, is a prosecuting attorney. The question whether the county attorney was absent or sick when the information against the defendant was filed, cannot of course be considered for the first time on appeal to this court.

The information described the property stolen as three fifty-dollar bills, lawful money of the United States, and averred a more particular description was unknown and could not be given. It is said there was no proof the bills were lawful money of the United States. There was evidence the bills had been paid and received as cash compensation for services rendered in a real-estate transaction. They were frequently referred to as money by persons who saw them, and they were sufficiently proved to be paper currency, circulating from hand to hand as measure of value and medium of exchange. Did the proof go far enough?

In the statute defining larceny, the term "money" was used in its generic sense, the purpose being to punish larceny of any species of money. At present the money in circulation in the United States consists of gold coin, gold certificates, standard silver dollars, silver certificates, subsidiary silver coin, minor coin, United States notes, treasury notes, federal-reserve notes, federal-reserve bank notes, and national-bank notes.

The code of criminal procedure contains the following provision:

"The words used in the indictment or information must be construed in

their usual acceptation in common language, except words and phrases defined by law, which are to be construed according to their legal meaning." (Gen. Stat. 1915, § 8021.)

In the act relating to national banks it is provided that the terms, "lawful money" and "lawful money of the United States," shall mean gold or silver coin, when applied to associations organized for the purpose of issuing gold notes; but the court is not aware of any statute, federal or state, which gives a general definition of either expression. There are numerous statements in judicial opinions which make lawful money the equivalent of legal tender, but the legal tender statute of the United States seems to recognize legal tender as a quality additional to lawful money.

"United States notes shall be lawful money, and a legal tender in payment of all debts, public and private, within the United States, except for duties on imports and interest on the public debt.

"Demand Treasury notes authorized by the act of July seventeen, eighteen hundred and sixty-one, chapter five, and the act of February twelve, eighteen hundred and sixty-two, chapter twenty, shall be lawful money and a legal tender in like manner as United States notes." (Rev. Stat. U. S., §§ 3588, 3589.)

As the supreme court of Iowa has pointed out, restriction of the term "lawful money" to money which is legal tender, has been influenced by the false notion that nothing can be money which is not legal tender. (State v. Finnegean, 127 Iowa, 286.) Thus, in the case of Pryor v. The Commonwealth, 32 Ky. (2 Dana) 298, decided in 1834, it was held that money meant nothing but gold and silver coin, and a charge of keeping a gaming table at which money was bet, lost, and won, was not sustained by proof that bank notes were bet, lost, and won.

In the Iowa case just cited, it was held a charge of larceny of "certain money, the same being lawful money of the United States," was sustained by proof of larceny of bank notes. Judicial opinion has caught up with common knowledge of economic fact, and the weight of authority now is that bank notes are money (Note, 4 Ann. Cas. 630); but the supreme court of Indiana held, in a larceny case, that "the notes of the national banks are in no sense money of the United States." (Hamilton v. The State, 60 Ind. 193, 194.) That decision was rendered in 1877, before paper currency came to par, and when much confusion of thought respecting the subject of money existed.

Aside from the fact that national-bank notes are money lawfully in circulation in the United States, they are in a true sense money of the United States. National-bank notes resemble the old state-bank currency in nothing but the fact of circulation as money. That currency came into existence without recognition by federal law, as an industrial, commercial, and social convenience. The notes were promises to pay on demand, issued by banks. Such notes had no vitality until issued, had no money force when returned to the issuing bank, and in economic effect constituted a borrowing from the public. National-bank notes are creatures of laws of the United States enacted pursuant to those constitutional provisions which give congress exclusive control over the money of the republic. One of the purposes to be accomplished was accommodation and advantage of the national government in conduct of its fiscal affairs. National-bank notes are issued by the government itself. They are issued to national banks to be put in circulation as money, and if bills put in circulation by a bank return to it, they continue to be money, and part of the assets of the bank. Indeed, national-bank notes are government money, advanced on government bonds deposited with the treasurer of the United States as security for redemption, and so are in fact money of the United States.

Federal-reserve bank notes are circulating notes issued to federal-reserve banks on government bonds which such banks have been required to purchase in the process of retiring national bank circulation, and so do not differ essentially from national-bank notes. Federal-reserve notes are obligations of the United States. In point of fact, all the varieties of money referred to in a previous paragraph enjoy equal confidence, circulate indiscriminately, are equally effective for business use, and in habit and practice are of uniform and interchangeable value. They pay debts, satisfy judgments, and are legal tender in law, unless specific objection be made to those forms which are not embraced in the legal-tender statute. The prevailing conception of lawful money of the United States is money in circulation by sanction of the laws of the United States. There is no substantial basis for legal distinction between the two forms of expression, unless it be in a few fiscal transactions of a technical character, not material here, and the court concludes the words of the information against the defendant should be construed in their usual acceptation. This being true, the proof was sufficient to sustain the charge.

It is said there was no evidence the stolen property had any value. It was not necessary to call witnesses to prove the value of the bills. If the circulating medium were of the heterogeneous kind and the uncertain and fluctuating value of the money in use at the time of the adoption of the constitution of the United States, proof of the value of any particular form would be important. State-bank notes, although expressed in dollars and supposedly redeemable in coin, were not of the same value in different places, or of constant value in the same place, and too frequently were of no value anywhere. Disorder of the currency occasioned by the Civil War often made value of kinds of money a matter of importance in legal proceedings. The resumption act, and measures taken pursuant to it, brought greenbacks and national-bank notes to the level of gold in popular confidence. After a long period of painful experience, in which greenback, free silver, silk money, and other currency aberrations were encountered, we now enjoy a monetary system which renders it quite as unnecessary to prove the value of a dollar bill, lawful money of the United States, as it would be to prove the length of a standard foot rule.

The judgment of the district court is affirmed.